***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Phillips and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award and therefore the Full Commission affirms the prior Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as a matter of law the following, which were entered into by the parties in a pre-trial agreement as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or non-joinder of parties.
4 An employment relationship existed between the parties at all relevant times.
5. At all times relevant to this action, defendant was self-insured for the purposes of meeting the requirements of the North Carolina Workers' Compensation Act.
6. As of July 22, 2002, plaintiff's average weekly wage was $337.56, yielding a compensation rate of $225.04.
7. As of October 6, 2003, plaintiff's average weekly wage was $392.52, yielding a compensation rate of $261.68.
7. Plaintiff has been out of work due to his denied left shoulder injury from October 30, 2003 to at least the time of the Deputy Commissioner's hearing. From October 30, 2003 through April 28, 2004, plaintiff received short-term disability benefits from an employer funded, non-contributory plan in the amount of $8,018.40, for which defendant is entitled to a credit.
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff was born on August 20, 1960 and lives in Murfeesboro, North Carolina.
2. Plaintiff completed the ninth grade and does not have any further education. Before coming to work for defendant, plaintiff worked at a tobacco warehouse in Windsor, North Carolina doing manual labor.
3. In 1982, plaintiff began working for defendant doing whole bird cut up. Plaintiff then operated a processing machine for about four and a half years. Plaintiff was terminated by defendant and remained out of work for about eight months before returning to employment with defendant as a chicken catcher in 1990. Plaintiff caught chickens using the coup system for about eight months. After catching chickens, plaintiff drove a forklift for approximately one year, before he got his commercial driver's license and began driving trucks for defendant.
4. In the early 1990's, plaintiff was terminated. Plaintiff was rehired in 1991 as a forklift driver and drove a forklift for approximately five years until he was returned to driving trucks in 1996. Plaintiff drove trucks from 1996 through 2000 without incident.
5. On September 28, 2000, plaintiff had an accepted workers' compensation injury to his right shoulder, which required rotator cuff surgery. This claim has been completely resolved.
6. Around January or March of 2002 through July 22, 2002, plaintiff drove a forklift for defendant. On July 22, 2002, plaintiff was involved in an accident that caused an injury to his hip and back. Defendants have denied this claim.
7. On July 22, 2002, plaintiff was performing his job duties as a forklift driver at a Jamesville farm. One of plaintiff's duties was to unload the forklift. Plaintiff dropped the ramps to unload the forklift and was walking up the ramp when he lost his footing. Plaintiff's foot slipped and he felt himself begin to fall. Plaintiff pushed back and had to jump off the ramp in order to keep from falling flat on his back. Plaintiff landed on his left side and felt pain up the left side of his back and hip. Plaintiff tried to walk it off but continued to have pain. Plaintiff notified his superior that he hurt his back.
8. Later that day, plaintiff went to the Perdue Wellness Center. Plaintiff was seen by the nurse and told to take Advil and return back the following day to see the doctor if he was not feeling any better.
9. On July 23, 2002, plaintiff returned to the Wellness Center, complaining of left hip and low back pain. After examination and x-rays, plaintiff was sent back to full duty work.
10. On July 30, 2002, plaintiff returned to the Wellness Center stating that his lower back was still hurting. Plaintiff was referred to Dr. Lawrence N. Larabee, Jr. with Northeastern Orthopaedics.
11. On August 1, 2002, Dr. Larabee saw plaintiff for lower back pain that radiated down the left leg. After the examination, plaintiff was scheduled for x-rays of his lumbar spine and an MRI was scheduled for August 14, 2002 at Roanoke-Chowan Hospital. Plaintiff was given restrictions of light duty work, which included no driving a forklift, until Dr. Larabee saw him again.
12. On August 26, 2002, plaintiff returned to Dr. Larabee's office to review the results of his MRI. The lumbar spine MRI results showed mild bilateral facet degenerative joint disease at L4-5 and at L5-S1, otherwise it was a negative lumbar spine MRI. Plaintiff was scheduled for physical therapy three times a week for six to eight weeks and was told to continue with the current work restrictions.
12. On September 23, 2002, Dr. Larabee released plaintiff back to full duty work and told plaintiff to continue with physical therapy. Plaintiff returned to Northeastern Orthopaedics on November 5, 2002 and December 11, 2002, with no physical findings for his continued pain. Plaintiff was referred to Dr. Keith Tucci, a neurosurgeon with Eastern Neurosurgical and Spinal Associates.
13. On January 6, 2003, Dr. Tucci saw plaintiff and arranged for a lumbar myelogram on January 7, 2003. The results of the myelogram showed no evidence of focal disc herniation, nerve root compression or central canal stenosis. The myelogram, however, did show some lower lumbar facet arthrosis and pseudoarticlation between L5 transverse process and left sacral ala.
14. Plaintiff continued to work as a forklift driver, but failed an eye test and was not allowed to continue to drive forklifts for defendant. In late spring 2003, plaintiff's foreman informed him that the only job they had available for him was catching chickens.
15. Plaintiff performed the job of catching chickens for defendant for approximately a month and a half. In order to perform this job, plaintiff caught three chickens in each hand. Each chicken weighed between four to six pounds. After catching the chickens, plaintiff put the chickens in a drawer. Plaintiff put the chickens in the bottom drawers first and then moved to the top two drawers. Plaintiff testified that he could drop the chickens in all the drawers if the chickens were around the normal weight, but if the three chickens in one hand were heavier than normal, plaintiff had to swing the chickens into the top drawer. This procedure was the usual and customary procedure plaintiff used to get heavier chickens into the top drawer.
16. On October 6, 2003, plaintiff testified that the chickens he had in his left hand were heavy and that, when he swung them into the top drawer, he heard a popping in his shoulder. Plaintiff reported the injury to his supervisor, Gary Whitney, and was told to go to the nurse. Plaintiff went to the Wellness Center, where an MRI of his left shoulder was scheduled. He was told not to use left arm until further notice.
17. On October 10, 2003, an MRI of plaintiff's left shoulder was performed. The MRI showed that plaintiff had a full thickness tear of the anterior aspect of the supraspaspiuatus tendon near its intersection site on the humerus. Upon reviewing the results of the MRI, the Wellness Center referred plaintiff back to Dr. Larabee.
18. Plaintiff saw Dr. Larabee on October 29, 2003 and was scheduled for surgery to repair his left rotator cuff tear. Plaintiff was admitted to Roanoke-Chowan Hospital on November 10, 2003 for left shoulder arthroplasy open rotator cuff repair. Plaintiff returned to Dr. Larabee's office on December 3, 2003 for a two-week status post left shoulder open rotator cuff repair follow up. Plaintiff reported that overall he had been doing well since his surgery.
19. On January 9, 2004, plaintiff returned to Northeastern Orthopaedics for a follow up appointment. Plaintiff reported that he was progressing well and that his pain was well controlled. Rotator cuff repair physical therapy protocol was scheduled and plaintiff was told to follow up in three weeks. Plaintiff was seen again on February 2, 2004 and March 1, 2004, and was doing well and advancing through physical therapy. Plaintiff was experiencing some discomfort with range of motion activities, but stated that overall his pain was well tolerated.
20. On April 5, 2004, plaintiff presented to Dr. Larabee's office because he was having some progressive difficulties with pain and with what he described as popping in his left shoulder. Dr. Larabee and plaintiff agreed that he would benefit from a cortisone steroid injection into the left shoulder and plaintiff was told to remain out of work until he was seen again in one month.
21. Plaintiff returned to Northeastern Orthpaedics on May 5, 2004, and reported that his pain had improved, but that he did have decreased range of motion. After a discussion of the risks, benefits and alternative therapy, it was recommended that plaintiff maintain his current plan of treatment and follow up at anytime with any concerns.
22. Plaintiff testified that he paid to be seen by other doctors for his back and that he was financially incapable of continuing to pay for continued back treatment or continued shoulder treatment.
23. The greater weight of the evidence does not establish that plaintiff sustained a compensable injury by accident on October 6, 2003. Plaintiff was performing his job duties in the normal manner and there was no interruption in plaintiff's work routine and no unusual condition that caused unexpected consequences.
 ***********
Based upon the foregoing Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident to his hip and back, arising out of and in the course of his employment on or about July 22, 2002. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff is entitled to receive medical treatment to his hip and back, including but not limited to a reevaluation of his hip and back injury by a doctor of his choice, so long as such treatment should effectuate a cure, alleviate plaintiff's pain or reduce plaintiff's disability. N.C. Gen. Stat. § 97-25.
3. Plaintiff was performing his regular work duties in the usual and customary manner when he was injured on October 6, 2003. Porter v. ShelbyKnit, Inc., 46 N.C. App. 22, 264 S.E.2d 37 (1980). As such, plaintiff did not sustain a compensable injury to his left shoulder by accident arising out of and in the course of his employment. N.C. Gen. Stat. § 97-2(6). Therefore, plaintiff is not entitled to receive medical treatment for his shoulder. N.C. Gen. Stat. § 97-25.
4. From October 30, 2003 through April 28, 2004, plaintiff received short-term disability benefits from an employer funded, non-contributory plan in the amount of $8,018.40, for which defendant is entitled to a credit.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay all medical expenses resulting from plaintiff's compensable injuries to his hip and back, and shall pay all future medical treatment which is needed as a result of these injuries to plaintiff.
2. Plaintiff's claim under North Carolina Workers' Compensation Act for the injury to his left shoulder on October 6, 2003 is hereby DENIED.
3. Defendant shall pay the costs.
This the 7th day of July 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER